**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**-against-**<br><br>**CRYPTOAIML LTD. and CRYPTOAIML CAPITAL FOUNDATION,**<br><br>**Defendants.** | **COMPLAINT**<br><br>**Case No. 1:26-cv-08508**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against Defendants Cryptoaiml Ltd. ("Cryptoaiml Ltd.") and Cryptoaiml Capital Foundation ("Cryptoaiml Capital") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1. This case involves an investment confidence scam in which the Defendants lured retail investors, some of whom became the Defendants investment advisory clients, to a purported crypto asset trading platform by claiming to be certified by regulators, including the SEC; gained investor and client confidence by impersonating investment professionals and issuing purported AI-generated trading "signals" or tips; manipulated investors and clients into sending the Defendants crypto assets; and directed investors and clients to pay fraudulent fees in fiat currency by telling them their accounts were frozen.

2. From at least August 2024 to March 2025 (the "Relevant Period"), the Defendants formed WhatsApp group chats purportedly run by experienced investment professionals who gave supposed investment recommendations to investors and, in certain cases, established an

investment adviser and client relationship with unwitting investors who signed investment management agreements that were represented to be legitimate.

3. After establishing trust with these investors and clients, Defendants directed them to open "trading" accounts on the purported crypto asset trading platform Defendants claimed to operate (the "Cryptoaiml Platform"). Once investors and clients opened these accounts and funded them with their assets, investors were provided with "trading signals" which they followed and resulted in their accounts reflecting large trading profits. Investors and clients could log into their accounts on the "trading" platform, which showed investors earning trading profits.

4. But the Cryptoaiml Platform was not a genuine trading platform, no trading took place, and any reflected profits were not real. In reality, the Cryptoaiml Platform was simply a vehicle created and used by Defendants to misappropriate investor and client funds. Defendants further defrauded investors and clients who tried to withdraw money from their "trading" accounts by demanding that they pay advance fees in order to gain access to any purported profits in their accounts.

5. Through the course of their fraud, the Defendants misappropriated at least $12.5 million from over 300 retail investors and clients throughout the United States.

## VIOLATIONS

6. By the conduct alleged in this Complaint, Cryptoaiml Ltd. and Cryptoaiml Capital violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] and Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

7. Unless Defendants are restrained or enjoined, they will engage in the acts,

practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions and courses of business of similar type and object in the future.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8. The SEC brings this action pursuant to Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e)], and Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e) and 80b-14].

9. The SEC seeks a final judgment: (a) permanently enjoining Cryptoaiml Ltd. and Cryptoaiml Capital from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)]; (b) ordering Cryptoaiml Ltd. and Cryptoaiml Capital to disgorge all ill-gotten gains from their violations alleged in this Complaint, and order them to pay prejudgment interest on their ill-gotten gains, under Sections 21(d)(3), (d)(5), and (d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (d)(5) and (d)(7)]; (c) ordering Cryptoaiml Ltd. and Cryptoaiml Capital to each pay a civil monetary penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; (d) imposing a conduct-based injunction that permanently restrains and enjoins each Defendant from directly or indirectly, acting as or being associated with any investment adviser; and (e) ordering any other relief the Court may deem just and proper.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action under Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa(a)] and Sections 209(d), 209(e)(1), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) and 80b-14].

11. Defendants Cryptoaiml Ltd. and Cryptoaiml Capital, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

12. Venue in this District is proper pursuant to Section 27(a) of the Exchange Act [15 U.S.C. §78aa(a)] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because Defendant Cryptoaiml Ltd. publicly represented to be headquartered in this district, and one of its purported investment advisers represented to a client that it had an office in this district. In addition, certain of the acts, practices, transactions, and courses of business constituting the violations of the federal securities laws alleged herein occurred within this District.

## DEFENDANTS

13. **Cryptoaiml Ltd.** is a New York corporation with its claimed principal place of business at 66 Hudson Boulevard East, New York, New York 10001, and was incorporated on August 28, 2024. It designated its agent as "James Peat" at the same claimed address. Cryptoaiml Ltd. is owned and controlled by persons unknown. On September 3, 2024, Cryptoaiml Ltd. filed a Notice of Exempt Offering of Securities on Form D ("Form D") with the SEC. On the Form D, Cryptoaiml Ltd. claimed to have revenue of over $100 million and claimed to have raised $10 million. In the same document, Cryptoaiml Ltd. listed its executive officer, director, and promoter as "James Peat" at the same claimed address. "James Peat" purportedly signed the Form D filed with the SEC.

14. **Cryptoaiml Capital Foundation** is a Colorado nonprofit corporation with its claimed principal place of business at 675 15th Street, Denver, Colorado 80202, and was formed on August 24, 2024. Cryptoaiml Capital is owned and controlled by persons unknown. Cryptoaiml Capital registered as a Money Service Business ("MSB") with the Financial Crimes

Enforcement Network ("FinCEN") on August 20, 2024.

## FACTS

### A. Defendants Formed Legal Entities, Filed a Form D with the SEC, and Created the Cryptoaiml Website and Fake Trading Platform

15. Within a span of 14 days – and in preparation for perpetrating the fraud scheme alleged herein – Defendants completed their legal formation, registered Cryptoaiml Capital as an MSB, and filed a Form D for Cryptoaiml Ltd. with the SEC.

16. The information supplied to the SEC to upload the Form D into the SEC's EDGAR (Electronic Data Gathering Analysis and Retrieval) system was false, including the name of Cryptoaiml Ltd.'s contact person, phone number, and email address. The person who signed the Form D purportedly as a director of Cryptoaiml Ltd. does not appear to exist, and the notarization of his signature was forged.

17. Defendants also created and operated a website, cryptoaiml.vip (the "Cryptoaiml Website" or the "Website"), through which investors and clients could create an account to access the Cryptoaiml Platform, a purported crypto asset trading platform.

18. Upon information and belief, at all times during the Relevant Period, the same individuals who formed the Defendant entities filed the Form D with the SEC, created the Cryptoaiml Website, and created the Cryptoaiml Platform.

19. Upon information and belief, at all times during the Relevant Period, these individuals controlled the Defendants, the Cryptoaiml Website, and the Cryptoaiml Platform.

20. The Website was central to Defendants' misappropriation of investor and client funds, as it was the gateway by which Defendants made a series of representations designed to make the Cryptoaiml Platform appear legitimate.

21. Defendants' representations on the Website portrayed the Cryptoaiml Platform as

widely used and legitimate. For example, the Website prominently claimed, "More than 1 million users join CRYPTO AI," and "1+M client[s]," "190+ Supported countries," and "$207B+ quarterly trading volume."

22. The Defendants represented on the Website in a section entitled "Who are we?" that, "[t]he core team of this platform comes[], including multiple early practitioners and investors in the digital asset industry with rich experience inInternet [sic] and financiatechnology [sic] research and development and global operations independently developed core trading system[s] has a fast and smooth user experience. This platform lsin [sic] the digital asset field. [sic] committed to creating the safest, most stable and efficientasset [sic] trading platform for alobal [sic] users."

23. Defendants represented on the Website that the Cryptoaiml Platform was operated by "parties who operate [a crypto asset platform,] including but not limited to legal and unincorporated organizations and teams that provide services and are responsible for the services."

24. Through the Cryptoaiml Website, Defendants also claimed to hold a "Reserve" for "all user assets at a reserve ratio of 1:1"; to use "Safe cold storage" in offline multi-signature wallets, and to have a "User Protection Fund" to protect against "security risks."

**B. The Cryptoaiml Website, Which Linked to the Form D and MSB Registration, Contained False and Misleading Information**

25. As part of their scheme to lure investors and clients – and then steal their funds – Defendants represented on the Website that Defendants were in compliance with financial regulations. This was not true.

26. The Cryptoaiml Website included a tab labeled "SEC" that, when opened, displayed results from sec.gov of Cryptoaiml Ltd.'s Form D filed with the SEC, as shown below:




//

//

//

//

//

//

//

//

//

//

27. The Website also included a tab labeled "MSB" that, when opened, displayed Cryptoaiml Capital's MSB registration, as shown below:




MSB Registration Status Information

Date: 08/23/2024

The inclusion of a business on the MSB Registrant Search Web page is not a recommendation, certification of legitimacy, or endorsement of the business by any government agency.

The MSB Registrant Search Web page, which is updated on a weekly basis, contains entities that have registered as Money Services Businesses (MSBs) pursuant to the Bank Secrecy Act (BSA) regulations at 31 CFR 1022.380(a)-(f), administered by the Financial Crimes Enforcement Network (FinCEN).

Information contained on this site has been provided by the MSB registrant. FinCEN does not verify information submitted by the MSB. Information provided on this site reflects only what was provided directly to FinCEN. If an error or incomplete information is detected on this site, the registrant should follow the appropriate instructions for correcting a Registration of Money Services Business (RMSB) form.

MSB Registration Number: 31000279510873
Registration Type: Initial Registration
Legal Name: CRYPTOAIML CAPITAL FOUNDATION
DBA Name: CRYPTOAIML CAPITAL

Street Address: 675 15th St
City: Denver
State: COLORADO
Zip: 80202

MSB Activities:
Check casher (including traveler's and money orders), Dealer in foreign exchange, Issuer of money orders, Issuer of traveler's checks, Money transmitter,
Seller of money orders, Seller of prepaid access, Seller of traveler's checks
States of MSB Activities:
Alabama, Alaska, American Samoa, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District Of Columbia, Federated States Of Micronesia, Florida, Georgia, Guam, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Marshall Islands, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Northern Mariana Islands,
Ohio, Oklahoma, Oregon, Palau, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Virgin Islands, US, Washington, West Virginia, Wisconsin, Wyoming
All States & Territories & Foreign Flag: All States/Territories, Foreign

Number of Branches: 0

28. The Defendants' inclusion of the Form D and MSB registration on the Website were designed to make Cryptoaiml Ltd. and Cryptoaiml Capital appear as legitimate entities and the Cryptoaiml Platform to appear compliant with financial regulations.

29. The Form D, however, was false and misleading because it included a fake name,

"James Peat," and included an address at which the filing entity, Cryptoaiml Ltd., did not do business.

30. Similarly, the MSB registration was false and misleading because it included an address at which the filing entity, Cryptoaiml Capital, did not do business.

### C. Defendants Took Steps to Solicit Individuals to Invest on the Cryptoaiml Platform

31. The Defendants created a myriad of WhatsApp group chats to lure investors and clients into their scheme with the sole purpose of stealing their funds.

32. Upon information and belief, persons associated with and employed by Defendants communicated with investors and clients through these chats.

33. Upon information and belief, at all times during the Relevant Period, the same individuals who controlled the Defendants, the Cryptoaiml Website, and the Cryptoaiml Platform, also controlled and managed the WhatsApp group chats.

#### 1. The Defendants Impersonated Established Investment Professionals and Made It Appear As Though They Were Affiliated with The Defendants

34. The Defendants used the WhatsApp group chats to impersonate real, established investment professionals at well-known investment firms who shared purported AI-generated trading signals, directed investors and clients to open accounts to "trade" crypto assets on the Cryptoaiml Platform, and make false and misleading statements designed to steal investor and client funds.

35. None of the real investment professionals or their firms had any involvement with the Defendants or this scheme, nor did they authorize the use of their names.

36. The Defendants, while posing as experienced investment professionals in group chats, boasted that their AI-generated trading signals enjoyed a 98% accuracy rate.

37. For example, on September 17, 2024, the Defendants created a WhatsApp group chat titled "VIP-Wealthy Affiliate Group," and by October 21, 2024, the Defendants began impersonating a real investment professional "Adviser A" purportedly affiliated with Raymond James & Associates, Inc. ("Raymond James"). On that same day, potential investors and clients began joining the group chat by responding to specific invitation links shared by Defendants with individual investors and clients.

38. On October 29, 2024, "Adviser A" issued a post on the Defendants' WhatsApp group with several "red alert" emojis crediting AI as having identified a profitable trading opportunity and revealing the purported specific trading strategy for a particular crypto asset. Minutes later, "Adviser A" claimed that he had made a 60% profit on this strategy. "Adviser A" continued to issue several posts about stock market indices and U.S. treasuries, economic data, and interest rates. He was joined in the chat by his "assistant" who, using a fictional name, offered to help group chat members set up their accounts on the Cryptoaiml Platform or answer questions via private message.

39. Defendants also impersonated another real investment professional, "Adviser B," president of Citadel Securities LLC ("Citadel Securities").

40. On September 24, 2024, Defendants created a WhatsApp group chat called "Citadel AI Community," supposedly led by "Adviser B" and his "assistant," who told investors in the chat that she was from "Miami, USA" and a graduate of Harvard University.

41. Both Adviser B and his "assistant" represented that "Adviser B" was the actual President of Citadel Securities. For example, on September 30, 2024, his "assistant" described the professional background of Adviser B, and listed the major well-known financial firms where he previously worked and listed his various undergraduate and graduate degrees from certain Ivy

League universities. In reality, Defendants simply copied these details directly from the real biography of Adviser B, the actual president of Citadel Securities, which appears on the public website of Citadel Securities.

42. "Adviser B's" posts in a group chat represented that an investment opportunity was being offered through Citadel Securities. For example, on September 30, 2024, "Adviser B" represented, "Hello everyone, welcome to Citadel AI Community. My name is [Adviser B]. I am honored to invite you to join this community. I also hope that all investors will continue to pay attention to this community. In the future, our team will continue to release important market information to help everyone have a deeper understanding of the market and profitable AI trading strategies, explore investment opportunities in the field of AI together, and lead everyone to define new finance."

43. On October 6, 2024, his "assistant" further represented that, "We are the [Adviser B] team, president of the Citadel Securities New Financial Center. We are a new institution set up by Citadel Securities specifically for trading cryptocurrencies."

44. Defendants at times incorporated the Cryptoaiml name into WhatsApp chats, creating the appearance of an association between legitimate investment firms, such as Raymond James and Citadel Securities, and Defendants. For example, in a January 5, 2025 WhatsApp private message to a potential client, Defendants posted under the name of another investment professional, "Adviser C," entitled "[Adviser C] Crypto AIML," stating, "our company has been analyzing stocks and trading stocks since last year, because the stock market has been in a depression for a long time, and because of the rapid development of AI, our company has decided to lead the way in trading cryptocurrencies using AI's calculation."

45. As another example, in the "Citadel AI Community" group chat, "Adviser B's"

"assistant" posted on October 1, 2024, stating, "Our [Adviser B] team currently focused on cryptocurrency market trading and securities consulting, helping you build the perfect portfolio . . . our team utilizes Artificial Intelligence to trade cryptocurrencies with up to 1,600% profit in 60 days."

### 2. Defendants Represented that the Cryptoaiml Platform was Safe and Certified by Regulators

46. As part of Defendants' scheme to lure investors and clients to deposit funds with the Cryptoaiml Platform, they repeatedly represented that the Cryptoaiml Platform was safe.

47. For example, the Defendants told one investor through the "[Adviser C] Crypto AIML" WhatsApp group chat on December 31, 2024 that "The cryptoaiml you are currently using is a legitimate platform certified by the SEC as well as the MSB" and "the platform is legal, because only the regular platform can pass the sec [sic] and MSB certification."

48. Defendants further represented through the same group chat to this investor on January 5, 2025 that "Our community also wants to give traders a legitimate trading environment to protect the safety of your funds, so we choose the platform is to choose [sic] through the SEC and MSB double certification."

49. Defendants similarly represented to another investor through WhatsApp on November 20, 2024 that the Cryptoaiml Platform has "MSB certificates and is regulated by the SEC. These are formal and safe platforms. You don't need to worry."

### 3. Defendants Guaranteed Investors and Clients Against Losses Who Joined Their "VIP" Program

50. Defendants encouraged investors and clients to join their exclusive "VIP" program by funding their accounts with additional principal in exchange for receiving better and more profitable AI-generated trading signals.

51. Defendants represented that investors and clients who joined the VIP program

would be granted access to "VIP Crypto AI" or "AI VIP" WhatsApp group chats where they would receive more AI-generated trading signals that would lead to even higher trading profits on the Cryptoaiml Platform. Defendants also promised VIP investors and clients guarantees against possible trading losses.

52. For example, on November 13, 2024 in the "F♠ Citadel Securities AI" group chat, "Adviser B" extolled the benefits of the VIP program, stating "I recommend everyone to join our [Citadel Securities] VIP premium program. This program provides investors with more comprehensive services and protection. Our team knows that investors are not only concerned about returns, but also the security of investment is equally important. In the VIP premium program, your funds will be best protected, and we will provide you with professional guidance and rich market information to ensure that every investment decision you make is the result of careful consideration."

53. Similarly, in a chat on January 8, 2025 with an investor, the purported assistant to Adviser B represented that "trading profit will be more than 5 times that of the general group" and that "Citadel Securities" will "bear up to 90% of your trading risks. If there is any loss, our team will compensate you."

**4. Defendants Posted Fake "Testimonials"**

54. Defendants' group chats frequently contained positive "testimonials," purportedly from other group chat members, designed to give investors and clients the assurance that the Cryptoaiml Platform and AI-generated trading signals were real and profitable. These "testimonials" were not from investors or clients but were fabricated to further Defendants' scheme. Defendants' group chats also contained fake congratulatory messages to investors who purportedly made large profits from following the AI-generated trading signals.

55. For example:

(a) On January 13, 2025 at 11:02 am in the "AI Advanced Community" group chat, Defendants impersonated an investor identified as "George" who posted "Yes. I was nervous and excited when I first joined. Until now, not only have I gained a lot of wealth in 2024, but in 2025, we are still standing with [Adviser B] now and Citadel Securities. This will be the happiest moment in my life."

(b) On January 16, 2025, in the "F♠ AI Advanced Community," "Adviser B" told investors to trade specific crypto assets and then congratulated those who did because they "achieved a total profit of 66%."

(c) On February 4, 2025 in the group chat "VIP♠ Crypto AI ♠,"
Defendants impersonated an investor identified as "Philip" who claimed to trade on Cryptoaiml's platform and stated "I feel very good about cryptocurrencies. The return on investment is very high. Higher than traditional real estate and stocks."

**D. Defendants Encouraged Investors to Liquidate Their Securities**

56. Defendants, while posing as experienced investment professionals in the group chats, pitched a repeated theme that investing in the stock market was risky, or at least not as profitable, as investing in crypto assets using the Defendants' AI-generated trading signals available only on the Cryptoaiml Platform.

57. Defendants also shared market conditions favorable to crypto asset investments, contrasting investments in other assets, such as real estate, as less attractive.

58. For example, in a November 12-13, 2024 group chat, Defendants, masquerading as "DaisyMargaret1 InvestmentGroup," the administrator for the "[Adviser D] Crypto Wealth Community," and also as "Adviser D," a purported analyst for the Cryptoaiml Platform,

described Cryptoaiml as a “global decentralized exchange.” “DaisyMargaret1” told a potential investor that the “current market prospects of cryptocurrency are very good. It is a safe-haven and a potential investment” and contrasted returns in the stock market with the profitability of following the AI-generated trading signals. “DaisyMargaret1” then asked the investor, “So do you think that the current returns from cryptocurrencies will be higher than those from stocks? I think the returns from cryptocurrencies are much higher than the returns from investing in stocks. . . If your funds are in a cryptoai contract account, I think your profits will be higher, and you use 50x for trading, then your profits will be magnified 50x.”

59. In another example, on January 2, 2025 at 3:46 pm in the “B[ ] AI JIM Community” group chat, Defendants impersonated an investor identified as “Garland” who posted in a WhatsApp group chat: “Enviable profit, I have been following it for a week. Mr. “[“Adviser B”]’s trading signals are profitable every time, which is cool. I plan to try it from 3K. If everything goes well, I will liquidate my stock account and transfer more funds to cryptocurrency for trading.”

60. In that same chat, Defendants impersonated another investor identified as “Barbara” who posted, “OMG, I just checked my stocks and, damn, they all dropped today. Intel’s price even went back to last year’s level. But the money I made from the group trades covered my losses in the stock market. I need to reorganize my assets and put more money into cryptocurrency investments.”

61. On January 15, 2025 at 1:36 pm, Defendants impersonated “Tony” who posted to others: “I am considering selling my stocks and putting the money into the AI account.” One minute later, in response, “Yosef” responded, “Hey man, you don’t think AI investing is more valuable than stocks, I already do, haha.”

62. In response, some investors and clients sold securities from their stock portfolios or 401(k) accounts to invest on the Cryptoaiml Platform. These investors and clients did so because they believed Defendants' representations in the WhatsApp group chats that diversifying their portfolios away from shares held in publicly traded companies to the crypto assets that were the subject of Defendants' AI-generated trading signals and were available to trade on the Cryptoaiml Platform would be more profitable and less risky.

63. For example, on or around October 2024 an investor sold employee stock options of a publicly traded company after receiving Defendants' WhatsApp group messages about diversifying his portfolio away from stocks, making more money trading crypto assets than trading stocks, and because, according to Defendants, Citadel Securities offered to guarantee 90% of the trading risk and any losses would be compensated.

64. On or around late December 2024 or early January 2025, another investor sold employee stock options in a publicly traded company because he read on WhatsApp chats that people withdrew funds from their 401(k) and brokerage accounts and that investing on the Cryptoaiml Platform was a way to diversify his portfolio.

**E. Defendants Created the False Impression that the Cryptoaiml Trading Platform Was Making Real Trades**

65. Investors and clients who opened "trading accounts" on the Cryptoaiml Platform were provided electronic wallet addresses by the Defendants' agents and were instructed to transfer their crypto assets into those wallets on the Cryptoaiml Platform. Defendants controlled these crypto wallets.

66. The Cryptoaiml Platform presented users with interfaces designed to imitate those of functioning crypto trading platforms.

67. For example, the main menu featured standard options such as trading, assets, and customer service, as shown below.




68. Other features included apparent "real-time" price displays for various crypto assets. After making their "deposit," investors also saw a dashboard which reflected continuously growing balances displayed via purported account summaries and balances as investors engaged in purported transactions by following "trading signals" appearing on the platform.

69. In reality, the purported real-time trading and trading signals that investors were purportedly following did not exist outside of their appearance on the Cryptoaiml Platform. The

profits were not real and no real trading occurred.

**F. Defendants Sent Investment Management Agreements to Certain Clients**

70. Through the WhatsApp group chats, Defendants also sent investment management agreements to clients purportedly taking responsibility for providing investment advice in managing client funds in exchange for the payment of management and performance fees.

71. Specifically, in at least two instances, clients signed Defendants' investment management agreements under which they agreed to pay management and performance fees, and the Defendants expected to receive such compensation, in exchange for the Defendants' provision of investment advice.

72. Under these agreements, the "Manager" would provide advice to clients regarding securities and were held out as engaged in the business of providing investment advice regarding securities for compensation.

73. For example, one investment management agreement that designated "Cryptoaiml Venture Capital Management Group" as the Manager represented that it was an investment holding company. The agreement vested the Manager with authority to "buy, sell, exchange, convert and otherwise invest or trade in any digital assets, but not limited to stocks, bonds, options, and other securities. . . ."

74. As to the Manager's compensation, the "Cryptoaiml Venture Capital Management Group" agreement included a fee schedule that specified that the investment adviser would not charge a fee as long as there were profits of 1200% per month or more based on the asset value as of the last day of each month.

75. In another agreement, it identified "[Adviser A], an investment holding company

of RAYMOND JAMES & ASSOCIATES, INC." as the investment manager and directed clients to visit https://adviserinfo.sec.gov/ for additional information. A potential client or client searching that website for additional information about Adviser A or Raymond James would have seen results for the real investment adviser representative and SEC-registered investment adviser.

76. This agreement also provided that the investment manager would provide "1. investment consulting and strategy formulation; 2. asset portfolio management; 3. valuable trading instructions; [and] 4. market analysis and reporting."

77. Under both agreements, the advice was communicated to clients through the WhatsApp group chats providing stock commentary and general trading advice.

### G. Defendants Prohibited Investors From Withdrawing Their Funds from the Cryptoaiml Platform

78. In instances where investors and clients sought to withdraw their ostensible profits, Defendants made a series of false excuses as a further means to misappropriate any remaining funds from investors and clients.

79. Defendants told investors and clients who sought to withdraw funds that their accounts were "locked" and/or "frozen" and they could not withdraw funds. In other situations, Defendants provided additional phony excuses why investors and clients could not withdraw their purported profits and directed investors and clients to message a "Crypto AI Service Center" representative via WhatsApp, who were in reality, the same persons controlling Defendants.

80. Defendants, via the Service Center representative, then directed investors and clients to transfer additional funds to "unlock" their accounts.

81. For example, on December 12, 2024, one investor was told by a representative of

the "Crypto AI Service Center" that he could not withdraw his funds because the SEC and "MSB" were investigating after the investor reported unauthorized transactions.

82. If investors and clients were unable or unwilling to send additional crypto assets, they were instructed by Defendants to send fiat currency directly to bank accounts held in the United States in the name of third parties including Flavyo Trading Corporation ("Flavyo"), Neurotech IT Solutions Inc. ("Neurotech"), INTY Endless LLC ("INTY"), and a sole proprietorship called Enjoy Time.

83. Defendants described these third parties to investors and clients as "market makers," "cooperative suppliers," or crypto firms that held large quantities of crypto assets.

84. For example, on January 14, 2025, Defendants through "Crypto ai Care" chats directed an investor to wire fiat to Flavyo. The investor was coached by Defendants to tell his bank that Flavyo was a "cooperative supplier" in the event that bank staff asked questions about the wire.

85. In another example, on January 21, 2025, Defendants directed an investor to wire fiat to Neurotech, which Defendants described in a chat was a "market maker." Defendants led the investor to believe that Neurotech had a large supply of crypto assets and that the fiat wired by the investor would be credited to his Cryptoaiml Platform account.

86. Defendants directed another investor to wire fiat to INTY, which was described as a "suitable market maker," in a chat from the "CRYPTO AI Service Center" on February 14, 2025. Defendants represented that the "market maker" would exchange the investor's cash for crypto assets. The same investor was directed by Defendants in a "CRYPTO AI Service Center" chat on February 24, 2025 to wire fiat to Enjoy Time to pay a "miner's fee" purportedly owed by the investor.

87. Flavyo, Neurotech, INTY, and Enjoy Time were each avenues that the Defendants created and/or used to misappropriate additional funds from investors and clients. Defendants controlled each of the bank accounts into which investor and client funds were deposited.

88. In some instances, investors and clients sold securities from their stock portfolios or 401(k) accounts to meet Defendants' fee demands for withdrawal.

89. As investors and clients grew increasingly concerned and demanded answers, "Adviser A," "Adviser B," their "assistants," and others impersonating investment professionals in the group chats, as well as the purported Crypto Ai Service Center representatives, all stopped responding.

**H. Defendants Misappropriated Investor Funds**

90. In reality, Defendants' goal was simple: to misappropriate crypto assets and fiat currency from investors and clients.

91. No trading took place on the Cryptoaiml Platform. Defendants posted fictitious trading profits in the investors' and clients' "trading accounts." The trading profits investors and clients thought they earned were fictious, and their original investment amounts were long since transferred overseas.

92. Defendants misappropriated a total of approximately $12,512,032 in funds, including both crypto assets and fiat currency, from at least 300 investors.

**1. Defendants Misappropriated Investor Funds in the Form of Crypto Assets**

93. Investors and clients who opened "trading accounts" on the Cryptoaiml Platform were provided wallet addresses and instructed by agents of the Defendants to transfer their crypto assets into those wallets, purportedly for investment on the Cryptoaiml Platform.

94. Once investors and clients transferred their crypto assets to their "trading accounts," persons associated with Defendants, often within a few days and sometimes in less than 24 hours, transferred these crypto assets across blockchains and through intermediaries, in some instances transferring to or through common wallet addresses.

95. From there, Defendants consolidated investor and client funds into specified wallets. Specifically, four primary crypto wallet addresses associated with the Cryptoaiml Platform received $11,998,455 in crypto assets from over 300 victims.

96. Upon information and belief, these crypto assets were then transferred outside of



97. Defendants controlled all crypto wallet addresses and associated accounts involved in the scheme used to misappropriate investor and client funds.

98. Crypto wallet addresses that directly or indirectly received ill-gotten gains through Defendants' fraudulent scheme included the following:

(a) 0xbcb2f169abc7abbb7d0543b28a351e8ee1fe44b2;

(b) 0xc35890ef8ef193e4994783cb6d0be80a020ab227;

(c) 0x8bbc74305ec4033c510f3b7150183c26e1db089b;

(d) 0xe4983f9374b4fa395af149cc0e0c098700909425;

(e) 1HKXVRczzvLkndbqdKNNcUD89yLkoowmem;

(f) 1Q5ddYLV6a4BukQfWZxdrsBGtjyHGKhJcL;

(g) 386HFi1HWQ5UaiSaNDm2ttBAp1wx9HN4k4;

(h) 1JKGf3TotEwTTrmT6Sn5dTDwraeBXPSvaw; and

(i) 1KcEjCHAmDiGipBczAJezjoEWTLr5fWWQz.

**2. Defendants Misappropriated Fiat Currency**

99. Defendants misappropriated approximately $513,577 in fiat currency from four investors and clients, who transferred these funds to "unlock" their accounts or were otherwise given false reasons to advance further funds.

100. As depicted in Chart B below, investor and client funds deposited into Flavyo and Neurotech accounts in the U.S. were then wired to accounts in the name of King Cloud Information Technology Consultants Est and Summit Information Technology Consultants Est, both of which were entities formed in the United Arab Emirates ("UAE"). The funds were commingled with other funds of unknown origin and transferred to other accounts held in different corporate names in the UAE.

## Chart B




101. As depicted in Chart C, below, investor funds deposited into INTY and Enjoy Time bank accounts in the U.S were comingled with deposits from unknown sources and were wired to U.S.-based accounts held in the names of Chinese companies Global Transline Services Co. Ltd. and Guangzhou Yanjin Trading Co. Ltd. Those funds were then transferred to other accounts held by Chinese companies.

## Chart C




102. Defendants controlled all fiat accounts involved in their scheme to misappropriate investor and client funds.

### 3. Defendants Coordinated All of the Transactions Involved in the Scheme

103. As alleged above, Defendants coordinated all of the transactions involved in the scheme.

104. This included incorporating Cryptoaiml Ltd. and Cryptoaiml Capital, creating the Cryptoaiml Platform, filing the Form D and MSB registration, forming and executing the WhatsApp group chats, directing investors and clients to transfer crypto assets to specific wallets and to wire fiat to U.S.-based bank accounts, and transferring investor and client funds outside the U.S.

105. Each of Defendants' agents acted in concert to misappropriate investor and client funds.

**I. Defendants Engaged in a Scheme to Defraud**

106. Defendants engaged in a scheme to defraud investors and clients by creating the impression that investors and clients who invested in the Cryptoaiml Platform were following legitimate crypto asset "trading signals," when in fact no trading actually took place on the Cryptoaiml Platform. In reality, Defendants were simply misappropriating investor assets.

107. To further this scheme, Defendants: (a) impersonated securities professionals; (b) incorporated entities in the U.S. using fictitious information; (c) filed a Form D and registered as an MSB, with false information, to appear as legitimate entities; (d) hyped a nonexistent trading platform on their website and WhatsApp groups; (e) shared fake "member" testimonials on the WhatsApp groups; (f) displayed nonexistent trading profits in investor and client accounts; (g) represented that their platform was regulated by the SEC; (h) guaranteed profits against losses; and (i) used multiple bank accounts (namely those of Flavyo, Neurotech, INTY, Enjoy Time, King Cloud, Summit, Global Transline, and Guangzhou) and crypto asset wallets to misappropriate investor and client funds.

108. Defendants also "lulled" and continued to defraud investors and clients into investing, by communicating through purported customer service representatives that sending additional funds would "unlock" their trading accounts.

**J. Defendants Made Materially False and Misleading Statements**

109. Defendants made multiple material misrepresentations to investors through various mediums: (a) on the Cryptoaiml Website; (b) through filings contained in incorporation documents, a Form D filed with the SEC, and a MSB registration with FinCEN; (c) in WhatsApp

group chats in the form of statements by agents posing as real investment professionals and their assistants; (d) testimonials in group chats from purported satisfied investors and clients; and (e) in the "Crypto AI Service Center" group chats statements by purported representatives.

110. Defendants made false and misleading statements on the Cryptoaiml Website by falsely claiming to be in compliance with the SEC and FinCEN regulations. They also filed a Form D containing false information. In reality, the Form D and MSB registration filed by the Defendants included fake names and other falsified information. The name identified on the Form D as Cryptoaiml Ltd.'s executive officer, director, and promoter was fake. The information supplied to the SEC to upload the Form D into EDGAR was false including the name of Cryptoaiml Ltd.'s contact person, phone number, and email address. The person who signed the Form D purportedly as a director of Cryptoaiml Ltd. does not appear to exist, and the notarization of his signature appears to have been forged.

111. Defendants made misstatements on the WhatsApp group chats including by claiming to provide "AI-generated trading signals" with a 98% accuracy rate and that investors and clients were receiving trading signals from securities professionals. In reality, the purported trading signals were not real, and the real securities professionals whose names were used without authorization were not involved with Defendants.

112. Defendants made further misstatements on WhatsApp group chats, including false statements about investor and client account balances and profitability. In reality, there was no trading on the Cryptoaiml Platform, and the account balances and profits investors and clients saw in their accounts were fabricated.

113. Defendants made false claims about accounts being "locked" due to regulatory actions or other false reasons and that various fees were required for investors and clients to

withdraw their money. In reality, Defendants simply misappropriated investor and client funds.

114. Defendants' false statements were material to investors' and clients' decisions to sell securities in their own brokerage accounts. Defendants' statements were designed to induce investors and clients to start "trading" on the Cryptoaiml Platform and, once they were supposedly making profits, to add more money into their accounts. In reality, Defendants wanted to misappropriate investor and client funds from any available source including their brokerage accounts.

115. A reasonable investor or client would have considered Defendants' false statements important in deciding whether to sell securities to trade on the Cyptoaiml Platform and to follow Defendants' investment advice, and disclosure of the truth would have significantly altered the total mix of information available to them.

### K. Defendants' Fraudulent Scheme and Materially False and Misleading Statements Were In Connection With the Purchase or Sale of a Security

116. Defendants' scheme and their materially false and misleading statements were in connection with the purchase or sale of securities.

117. As alleged above, (1) Defendants encouraged investors and clients to sell their securities holdings by warning of the purported relative dangers of investing in stocks as compared to trading crypto assets; (2) the proceeds of the fraud were derived from securities transactions; and (3) the investment management agreements provided by Defendants to clients represented that they would invest clients' assets in "stocks, bonds, options, and other securities."

118. The misrepresentations and fraudulent scheme described above were designed to convince, and succeeded in convincing, investors and clients to fund their purported trading account on the Cryptoaiml Platform for the purpose of Defendants misappropriating their assets.

### L. Defendants Acted As Investment Advisers

119. As alleged above, Defendants, for compensation, engaged in the business of providing advice to others or issuing reports or analyses regarding securities.

120. At least two clients signed Defendants' investment management agreements under which they agreed to pay management and performance fees, and the Defendants expected to receive such compensation, in exchange for the Defendants' provision of investment advice.

121. Under Defendants' agreements, the purported "manager" would provide advice to clients regarding securities and was held out as engaged in the business of providing investment advice regarding securities. The purported "manager" in one instance was "Cryptoaiml Venture Capital Management Group." In another instance, it was "RAYMOND JAMES & ASSOCIATES, INC."

122. As alleged above, the agreements provided for compensation to the purported "manager."

### M. Defendants Acted With Scienter

123. Defendants acted with scienter because persons controlling and/or representing the Defendants made numerous statements that they knew or were reckless in not knowing were false, including statements on Cryptoaiml's Website, in the WhatsApp group chats, and in the Cryptoaiml Ltd. Form D filed with the SEC.

124. Defendants knew, or were reckless in not knowing, that (1) investment professionals at well-known firms were not involved in disseminating trading signals or otherwise affiliated with the Cryptoaiml Platform, (2) the Cryptoaiml Venture Capital Management Group and purported Raymond James investment management agreements were illusory, (3) there were no "market makers," and (4) that Cryptoaiml Ltd.'s Form D and Cryptoaiml Capital's MSB registration were filed with false information and were filed to

provide the Cryptoaiml Platform with the appearance of legitimacy.

125. Defendants also knew, or were reckless in not knowing, that there was no trading on the Cryptoaiml Platform, the profits appearing in client accounts were non-existent, investors and clients could not withdraw funds from their accounts, and that investors' funds were misappropriated.

**FIRST CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5(b) Thereunder**

126. The SEC realleges and incorporates by reference each and every allegation in paragraphs 1 through 125, as if they were fully set forth herein.

127. Defendants made false and misleading statements through their Website, through filings contained in incorporation documents, in the "Crypto AI Service Center" group chat statements by representatives, in WhatsApp group chat statements by "Adviser B," "Adviser B's," or other investment professionals/Moderators, and statements from purported satisfied investors and clients, including statements (1) about the involvement of investment professionals and firms, (2) the use of AI-generated trading signals, (3) the safety and legitimacy of Cryptoaiml Ltd., Cryptoaiml Capital, and the Cryptoaiml Platform, (4) trading profits and profit guarantees, and (5) fees required to "unlock" accounts, including the role of purported "market makers."

128. By engaging in the conduct described above, Defendants knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails or of any facility of a national securities exchange, made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

129. By engaging in the foregoing conduct, Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

**SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and 10b-5(c) Thereunder**

130. The SEC realleges and incorporates by reference each and every allegation in paragraphs 1 through 125, as if they were fully set forth herein.

131. Defendants engaged in a scheme to defraud investors by engaging in a deceptive course of business through which they disseminated false information by: (a) impersonating real investment professionals; (b) filing incorporation documents, a Form D, and MSB registration with false information to appear as legitimate entities; (c) impersonating satisfied investors and clients in the group chats; and (d) fabricating investment management agreements to appear as if they were investment advisers.

132. By engaging in the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

133. By engaging in the conduct described above, Defendants have violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

**THIRD CLAIM FOR RELIEF**
**Violations of Advisers Act Sections 206(1) and (2)**

134. The SEC realleges and incorporates by reference each and every allegation in paragraphs 1 through 125, as if they were fully set forth herein.

135. Defendants, at all relevant times, were investment advisers within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

136. Defendants orchestrated a scheme to misappropriate clients' funds by (1) disseminating bogus investment management agreements to at least two clients, (2) deceiving prospective clients and clients with false and misleading statements about (a) the involvement of investment professionals and firms, (b) the use of AI-generated trading signals, (c) the safety and legitimacy of Cryptoaiml Ltd., Cryptoaiml Capital, and the Cryptoaiml Platform, (d) the trading profits and profit guarantees, and (e) the fees required to "unlock" accounts, including the role of purported "market makers."

137. By engaging in the conduct described above, Defendants, by the use of the mails, and means and instrumentalities of interstate commerce, directly or indirectly, knowingly or recklessly employed a device, scheme and artifice to defraud their clients and prospective clients, and knowingly, recklessly or negligently engaged in transactions, practices, and a course of business which operates as a fraud or deceit upon their clients and prospective clients.

138. By engaging in the conduct described above, Defendants have violated, and unless restrained and enjoined, will continue to violate, Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

**I.**

Issuing findings of fact and conclusions of law that Defendants committed the alleged violations.

**II.**

Permanently enjoining Cryptoaiml Ltd. and Cryptoaiml Capital Foundation, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-(6) and 80b-6(2)].

**III.**

Permanently enjoining Cryptoaiml Ltd. and Cryptoaiml Capital Foundation from, directly or indirectly, acting as or being associated with any investment adviser. For purposes of this paragraph a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), or, directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment adviser.

**IV.**

Ordering Defendants to disgorge all ill-gotten gains from their violations alleged in this Complaint and order them to pay prejudgment interest on their ill-gotten gains, under Sections 21(d)(3), (d)(5) and (d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78(u)(d)(7)].

**V.**

Ordering Defendants to pay civil monetary penalties under Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-

9(e)].

**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Ordering any other relief this Court may deem just and proper.

**JURY DEMAND**

The SEC demands a trial by jury.

Respectfully submitted,

Dated: Los Angeles, California
September 29, 2026

*<u>/s/ Ruth C. Pinkel</u>*

Ruth C. Pinkel
*Pro hac vice application pending*

SECURITIES AND EXCHANGE COMMISSION
Los Angeles Regional Office
444 South Flower Street, Ste. 900
Los Angeles, CA 90071
Telephone: (323) 965-3322
pinkelr@sec.gov

*Attorney for Plaintiff*